## CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed March 17, 1898.

ALBERT N. HORNER
VS.
JOHN McGLONE.

*Richard B. Tippett* for plaintiff.

*John Henry Keene, Jr.,* and *W. H. DeC. Wright* for defendant.

SHARP, J.—

The bill in this case was filed to obtain an injunction.

It appears from the evidence that McGlone, the defendant, a dealer in horses and owner of a profitable livery and sales business, applied to Horner for a loan. At this time Horner held bills of sale on part of McGlone's property, to secure loans amounting to about $600. McGlone was heavily indebted to various persons; judgments had been obtained against him, and his creditors were pressing for payment. The leasehold property in which his stable was situated was mortgaged, the interest was in arrear and the mortgagee had threatened foreclosure. McGlone had built up a profitable business, which he was anxious to preserve, and desired to make an arrangement with his creditors and it was to raise money for that purpose he applied to Horner.

McGlone explained his financial trouble to Horner, who agreed to advance McGlone $1,200 to settle with his creditors on certain conditions, which were, that McGlone's property, including the leasehold property, chattels, accounts, and the business, etc., should be conveyed absolutely to Horner; that McGlone should remain at the stable for eighteen months at a salary of ten dollars per week, and have no other business; when Horner should have received $3,900 (which was twice as much as McGlone owed Horner after the last loan of $1,200, and three times as much as the sum loaned when the transaction was made), out of the profits of the business, he was to sell the property back to McGlone for five dollars. McGlone's right, however, to such reconveyance depended on his remaining at the stables for eighteen months at a salary of ten dollars per week. Horner's relation to the business was to be kept a secret.

It was a condition made by Horner that McGlone should have no lawyer.

In fact, Mr. Horner refused to proceed with the negotiations until Mr. Wright, McGlone's attorney, had left the room. McGlone being in great distress of mind, apprehensive of ruin from the action of his creditors, and anxious to settle with them and preserve his business, and being confident the profits of the business would soon repay Horner the sum advanced, assented to the hard terms imposed on him. He transferred the property to Horner, who agreed to reconvey on the terms stated. All the papers were prepared by Horner. McGlone is illiterate and ignorant of legal forms, and was not allowed to have the advice of counsel.

The value of the leasehold estate and chattels conveyed does not clearly appear. The parties relied more on the good-will and McGlone's ability and the profits than the value of the property.

It was not intended that the property should be sold; the debt was to be paid out of the profits. The business was an excellent one. Horner says there were from sixty to seventy-five horses in the stable at livery at the time it was transferred to him, though this was not the best season. McGlone's customers were of an excellent class, and he possessed their confidence and good-will. He had been some years building up the business and the profits were estimated at from $200 to $300 per month. Horner thought that in eighteen months at most the net profits would repay the sum advanced with the handsome bonus agreed on.

After the conveyance of the property dissention soon arose. Horner assumed to be the absolute owner and wished to treat McGlone as a mere laborer or employee, liable to be discharged at Horner's will, and without any voice in the management of the business and without any rights whatever until the business under Horner's management had yielded Horner out of the profits the sum of $3,900. Horner attempted against McGlone's protest to change the character of the business, abandoning the sale and hiring features and doing exclusively a livery business. McGlone believing himself to be in the position of a mortgagor in possession, and the substantial owner of the property to whom it

reverted in a few months after Horner's claim for $3,900 had been paid, insisted on conducting the business as it had been conducted, and resisted Horner's attempts to entirely control the business, and to change its character.

These dissentions soon culminated in a complete breach, in which McGlone was guilty of the high-handed and violent conduct which led to these proceedings.

It is in aid of the transaction I have described that Horner now asks a Court of equity to grant an injunction.

It is an ancient maxim in equity that "He that committeth inequity shall not have equity." Expressed in its modern form, this maxim is, "He who seeks equity must come with clean hands." If the complainant's conduct has been illegal, fraudulent or inequitable, relief will be denied. If a contract has been obtained by sharp and unscrupulous practices, by over-reaching, or by taking undue advantage of the other party's position, or if the contract is unfair, one-sided, unconscionable or oppressive, or would work injustice, relief in equity will be denied.

The complainant will be left to his action of damages at law.

1 Story's Equity Jurisdiction, Secs. 64-239.

Pomeroy's Equity, Sec. 397, &c.

McGlone was an illiterate man, ignorant of legal forms. All the papers were written by Horner, and while they appear to have been read to McGlone before he signed them, he was ignorant of their legal effect. This was shown by his subsequent conduct, for notwithstanding the execution of the papers, McGlone still thought himself the absolute owner of the property, with the same power as before the execution of the assignment. He was not allowed to get the advice of counsel before signing the papers. He was in great distress of mind, anxious to preserve the business he had built up, harrassed by his creditors and in danger of being sold out by the mortgagee and the judgment creditor. The parties did not meet on equal terms. Horner had the upper hand and was in a position to dictate terms. McGlone's circumstances and condition of mind were known to Horner, who says in his testimony, McGlone "did not know whether he was on his head or his feet; he wanted money and he was not going to go through insolvency if he could help it, and James was going to close him out, and he couldn't borrow any money, and I told him I would not lend him any money, so I turned around and bought it."

The contract was oppressive and inequitable. The property conveyed yielded a profit of from two to three hundred dollars a month. It was expected that the net profits would pay $3,900 in eighteen months at most. This property was conveyed for the consideration of $1,200. McGlone agreed to work at the stable, and not to work elsewhere, for eighteen months at a mere living salary, much less than he could earn elsewhere. His right to a reconveyance of the property was of a most precarious character, practically he was completely in the power of Horner. He was to pay $3,900 when he only received $1,200, or taking into consideration the old debt, $1,800.

These facts show conclusively that McGlone was overreached and defrauded.

1 Story Eq. Jurisdiction, Secs. 64-239.

Pomeroy's Equity, Sec. 397, &c.

It was argued that McGlone's conduct in connection with the management of the stables, in the collection of debts, purchase and sale of horses and carriages, and in interfering with Horner's lawful rights, and particularly his high-handed and violent conduct prior to the injunction, has been such that he is not entitled to relief in a Court of equity. It is sufficient to say that McGlone's position is purely defensive. He asks no relief, and the maxim has no application to him.

Exceptions to the evidence were filed by both siles. The exceptions of the defendant were too indefinite to be considered. The particular evidence, even the names of the witnesses, were not mentioned. These exceptions are overruled. The complainant's exceptions are overruled except the exception to the question asked McGlone, which is leading. The exception to this question is sustained.

It follows from what I have said that the injunction must be dissolved and the bill dismissed.